AO 106 (Rev. 04/10) Application for a Search Warrant



FILED

APR 2 4 2025

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
3 Dimmock Avenue
Newport News, Virginia 23601

)
)
)
)
)
)
)

Case No. 4:25-sw-35

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
  See Attachment A

located in the _____ Eastern _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:
  See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
  ☑ evidence of a crime;
  ☑ contraband, fruits of crime, or other items illegally possessed;
  ☑ property designed for use, intended for use, or used in committing a crime;
  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251(a) and (e) | Attempted Production of Child Pornography |

The application is based on these facts:

See affidavit

  ☑ Continued on the attached sheet.
  ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

REVIEWED AND APPROVED:

_____
Peter G. Osyf
Assistant United States Attorney

_____
*Applicant's signature*

Heather Call, Task Force Officer, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 04/24/2025 _____

_____
*Judge's signature*

City and state: Norfolk, Virginia _____

The Hon. Lawrence R. Leonard, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched is the residence, outbuildings, and vehicles contained thereupon the property as follows:

The residence is located at **3 Dimmock Avenue, Newport News, Virginia, 23601**, (the "**SUBJECT PREMISES**"). It is described as one-story red brick residence with a white front door and black storm door. The number "3" appears above the door, just below the gutter.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

The items to be seized as evidence, fruits, and instrumentalities of the violation of Title 18, United States Code (U.S.C.), Sections 2251(a) and (e) include the following:

1.  Records, documents, materials, videos, and photographs, pertaining in any way to child pornography and visual depictions of minors engaged in sexually explicit conduct (hereinafter collectively referred to as "child pornography"), child erotica, and materials pertaining to an interest in child pornography, in whatever format found.

2.  Records, documents, materials, and correspondence pertaining to the production possession, receipt, or distribution of child pornography, and any records indicating whether such was transmitted or received using a computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail.

3.  Records, documents, materials, envelopes, letters, and other correspondence including electronic mail, chat logs, and electronic messages, seeking to obtain and/or offering to transmit child pornography through interstate or foreign commerce, including U.S. mail or by computer.

4.  Records, documents, materials, envelopes, letters, and other correspondence including electronic mail, chat logs, and electronic messages, identifying persons transmitting or offering to transmit any visual depictions of minors engaged in sexually explicit conduct and any records identifying the means of such transmission.

5.  Records, documents, materials, and photographs depicting sexual conduct, whether between adults and minors or between minors.

6.  Records, documents, materials evidencing occupancy or ownership of the premises to be searched, including but not limited to, utility bills, mail envelopes, or addressed correspondence.

7.  Records, documents, materials or other items which evidence ownership or use of computer and electronic equipment found in the above residence, including sales receipts, bills for Internet access, records containing account/user names and passwords, handwritten notes, and handwritten notes in computer manuals.

8.  Records, documents, and materials pertaining to the production, reproduction, receipt, shipment, ordering, soliciting, trading, purchasing, or transactions of any kind involving the transmission through interstate or foreign commerce, including by U.S. mail or other common carrier or by computer or electronic device, of child pornography.

9.  Records, documents, and materials, including bank, financial, and credit card records, pertaining to the purchase of materials or access to materials containing child pornography.

10. Computer hardware, including central processing units (CPUs), computer software and programs, laptop computers, monitors, keyboards, printers, computer disks (including floppy disks, CDs, DVDs), scanners, disk drives, modems, routers, magnetic storage media, thumb or flash drives, memory sticks, PDAs, digital cameras and memory cards, cell phones, smartphones, I-Phones, I-Pods, I-Pads, electronic notebooks and tablets, hardware and software operating manuals, post-it notes, records containing account/user names and passwords, and other computer-related and/or electronic equipment and/or digital media, to be inspected off-site using appropriate mirror-imaging and other equipment after seizure, which are used as instrumentalities of the crimes noted or which contain any of the items noted in paragraphs 1-9 above.

11. Any of the items described in paragraphs 1-9 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment, including floppy diskettes, fixed hard drives, removable hard drives, software, PDAs, cell phones, or memory in any form, to be inspected off-site using appropriate mirror-imaging and other equipment after seizure.

During the execution of this search warrant, for devices law enforcement is permitted to: (1) depress Robert Inge's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Robert Inge's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in *Graham v. Connor,* 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

Further, law enforcement may compel the use of the biometric features described above if: (1) the procedure is carried out with dispatch and in the immediate vicinity of the premises to be searched, and if, at the time of compulsion, the government has (2) reasonable suspicion that Robert Inge has committed a criminal act that is the subject matter of the warrant; and (3) reasonable suspicion that Robert Inge's biometric features will unlock the

device, that is, for example, because there is a reasonable suspicion to believe that Robert Inge is the user of the device.

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

### Introduction and Agent Background

I, Heather Call, being duly sworn, hereby depose and state:

1.      Your affiant, Heather Call, employed with the Newport News Police Department (NNPD) since June 2004, and more specifically with the Special Victims Unit since July 2011. This assignment has afforded me the opportunity to investigate and/or arrest and prosecute numerous individuals for crimes relating to the neglect and abuse of children in violation of the Virginia (VA) State Code. I have previously been involved in criminal investigations concerning violations of federal laws. Those investigations included, but are not limited to, child exploitation and child pornography. Since joining the NNPD your affiant has attended specialized training courses in child/adolescent interviewing, human trafficking, identifying, and seizing electronic evidence, and computer forensic, recovery, and social site investigations.

2.      I am currently assigned as a Master Police Detective with the Newport News Police Department, Criminal Investigations Division, Special Victims Unit, as well as a Task Force Officer (TFO) assigned to the Federal Bureau of Investigation, Norfolk Division Child Exploitation Task Force. I have participated in investigations involving sexual assaults, persons who collect and distribute child pornography, and distribution of materials relating to the sexual exploitation of children. I have received training from the FBI in the areas of sexual assaults and child exploitation, and I have reviewed images and videos of child pornography in a wide variety of media forms, including computer media. I have also discussed and reviewed these materials with other law enforcement officers.

3.      In the course of my employment as a sworn law enforcement officer, I have participated in the execution of numerous search warrants resulting in the seizure of computers, magnetic storage media for computers, other electronic media, and other items evidencing violations of state and federal laws, including various sections of Title 18, United States Code § 2251 *et. seq.* involving child exploitation offenses.

4.      I was deputized as a Special Deputy United States Marshal on June 16, 2014. As a Special Deputy United States Marshal, your Affiant is authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

### Location

5.      This affidavit is made in support of an application for a warrant to search the entire premises located at **3 Dimmock Avenue, Newport News, Virginia, 23601**, (the "**Subject Premises**"), (more precisely described in Attachment A).

1

6.    This affidavit is based upon information that I have gained from my investigation, my training and experience, as well as information gained from conversations with other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities (more precisely described in Attachment B) of violations of Title 18, United States Code, Sections 2251(a) and (e)  are located at the above address.

## Pertinent Federal Criminal Statutes

7.    This investigation concerns alleged violations of Title 18, United States Code, Sections 2251(a) and (e) relating to material involving the sexual exploitation of minors.

8.    Title 18, United States Code, Section 2251(a) provides that any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

9.    Title 18, United States Code, Section 2251(e) prohibits an attempt and conspiracy to violate Title 18, United States Code, Section 2251(a).

## Definitions

10.    The term "computer," as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

11.    The terms "records," "documents," and "materials" include all information recorded in any form, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, including, but not limited to the following:

2

Graphic records or representations, photographs, pictures, images, and aural records or representations.

12.     The terms "minor" and "sexually explicit conduct" are defined in Title 18, United States Code, Sections 2256(1) and (2). A "minor" is defined as "any person under the age of eighteen years." The term "sexually explicit conduct" means actual or simulated:

  i.     Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
  ii.    Bestiality;
  iii.   Masturbation;
  iv.    Sadistic or masochistic abuse; or
  v.     Lascivious exhibition of the anus, genitals or pubic area of any person.

13.     Universal Resource Locator (URL): A URL is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies the specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

14.     Internet Protocol Address (IP Address): Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. There are two types of IP addresses, static and dynamic. A static address is permanent and never changes, such as ones used in cable modems. The dynamic address changes almost every time the computer connects to the Internet.

15.     The term "Internet Service Provider" (ISPs): This term refers to individuals who have an Internet account and an Internet-based electronic mail (e-mail) address, who must have a subscription,   membership, or affiliation with an organization or commercial service that provides access to the Internet. A provider of Internet access and services is referred to as an Internet Service Provider or "ISP."

16.     The term "Secure Hash Algorithm" (SHA-1) is one of a number of cryptographic hash functions published by the National Institute of Standards and Technology as a U.S. Federal Information Processing Standard. SHA-1 is the original 160-bit hash function. It was designed by the National Security Agency (NSA) to be part of the Digital Signature Algorithm. The SHA-1 value is one form of an electronic fingerprint for a digital image.

17.     "Web hosts" provide the equipment and services required to host and maintain files for one or more websites and to provide rapid Internet connections to those websites. Most hosting is "shared," which means that multiple websites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a Website, the client needs a server and

3

perhaps a web hosting company to host it. "Dedicated hosting," means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a website. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co-location facilities offer customers a secure place to physically house the customers' hardware and equipment as opposed to keeping it in their offices or warehouse, where the potential for fire, theft or vandalism is greater.

18.    "Electronic Communication Service" refers to any service which provides to users thereof the ability to send or receive wire or electronic communications. 18 U.S.C. § 2510(15).

19.    "Remote Computing Service" is a service that provides to the public computer storage or processing services by means of an "electronic communications system." 18 U.S.C. § 2711.

20.    "Electronic Communications System" means any wire, radio, electromagnetic, photo-optical, or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications. 18 U.S.C. § 2510(14).

21.    "Contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication. 18 U.S.C. § 2510(8).

22.    "Electronic storage" means (a) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (b) any storage of such communication by an electronic communication service for purposes of backup protection of such communication. 18 U.S.C. § 2510(17).

## Specifics of Search and Seizure of Computer System and Related Media

23.    Your affiant, based on conversations with Computer Investigative Specialists, who have been trained in the seizure, examination and retrieval of data from personal computer systems and related media, knows that searching and seizing information from computer systems often requires agents to seize all electronic storage devices to be searched later in a laboratory or other controlled environment.

24.    Computer storage devices (like hard drives, diskettes, tapes, laser disks, and thumb or flash drives) can store enormous quantities of information. For instance, a single 200-gigabyte hard-drive may contain the electronic equivalent of hundreds of thousands of pages of double-spaced text. However, unlike the search of documentary files, computers store data in files that are often not easily reviewed. Additionally, a suspect may try to conceal criminal evidence by storing files in random order and/or with deceptive file names. This may require the examiner to

4

examine all the stored data to determine which particular files are evidence or instrumentalities of the crime. This sorting process can take weeks or months, depending on the volume of data stored.

25. Searching computer systems for criminal evidence is a highly technical process, requiring specialized skills and a properly controlled environment. The vast array of computer hardware and software available requires even computer examiners to specialize in some systems and applications, so it is difficult to know before a search which computer investigative specialist is qualified to analyze the system and its data. In any event, the investigative specialist will use certified forensic tools and data search protocols that are designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (from external sources and/or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

26. An important step that is ordinarily part of an examiner's forensic examination of a computer involves attempting to create an electronic "image" of those parts of the computer that are likely to store the evidence, fruits, instrumentalities, or contraband relating to the applicable offense. Imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.

### Use of Computers with Child Pornography

27. Based upon my training and information officially supplied to me by other law enforcement officers, your affiant knows the following:

28. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. They have also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

29. The development of computers has added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers serve four functions in connection with child pornography. These are production, communication, distribution and storage.

a. Pornographers can now produce both still and moving images directly from a common video camera. The camera is attached, using a cable, directly to the computer using a device called a video capture board. This device turns the video output into a form that is usable by computer programs. The output of the video

5

camera can be stored, manipulated, transferred or printed directly from the computer. The captured image can be edited in very similar ways to a photograph. The image can be lightened, darkened, cropped, and manipulated in a wide variety of ways. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store and distribute child pornography. There is the added benefit to the pornographer that this method of production does not leave as large a trail for law enforcement to follow as methods that have been used in the past.

b. Previously, child pornography collectors had to rely on personal contact, U.S. mail, and telephonic communications in order to sell, trade, or market pornography. The development of the computer has also changed that. A device known as a modem allows any computer to connect to another computer using telephone lines or other cable lines. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. These host computers are sometimes operated by commercial concerns, such as Microsoft and America Online, which allow subscribers to access their network services via connection through an Internet broadband provider or by dialing a local number and connecting via a telephone modem.

c. These service providers allow electronic mail ("e-mail") service between subscribers and between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web; hence, they are commonly described as Internet Service Providers (ISPs). Some of these systems offer their subscribers the ability to communicate publicly or privately with each other in real time using a mode of communication called instant messaging, or "IM." When logged into an IM service, users can search for other users based on the information that the other users have supplied, and they can send those users messages or initiate a chat session. Chat sessions can occur in multiple person groups, or in private one-on-one sessions. Most IM services also allow files to be transferred between users, including image files.

d. These communications structures are ideal for the child pornography collector. The open and anonymous communication allows users to locate others of similar inclination and still maintain their anonymity. Once contact has been established, it is then possible to send text messages and graphic images to other trusted child pornography collectors. Moreover, the child pornography collectors can use standard Internet connections, such as those provided by business, universities, and government agencies, to communicate with each other and to distribute pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively

6

secure, and anonymous as desired. All of these advantages are well known and are the foundation of transactions between child pornography collectors.

e.     The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution of child pornography. For example, child pornography can be transferred (via electronic mail, through file transfer protocols (FTPs), or via news group postings) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services, and easy access to the Internet, the computer is a preferred method of distribution of child pornographic materials.

30.     The computer's capability to store images in digital form makes it an ideal repository for pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of five hundred (500) gigabytes are not uncommon. These drives can store hundreds of thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the scene of the crime. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

31.     Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for extended periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

7

**Probable Cause to Search**

32.     On November 11, 2024, Snapchat filed CyberTipline report 202200264 with the National Center for Missing and Exploited Children (NCMEC). In that report, Snapchat advised of possible sexual molestation based on a reported chat log dated October 15, 2024, through November 10, 2024. The intended chat recipient claimed, "This dude is talking about how he uses his nephew to jerk him off." Snapchat provided the user's phone number as 17575530915, date of birth 06-15-1989, username as drewinva15, and an IP address. A portion of the chat was also included and is as follows:

> Chat recipient: Haha that's good
> Drewinva15: They are very needy/handsy but whatever lol not always a bad thing
> Chat recipient: Nah it's not
> Drewinva15: Haha hence why I don't mind watching them (devil emoji)
> Chat recipient: What exactly do they help with?
> Drewinva15: Well the older kid likes to help me out with tasks lol
> Drewinva15: (two big eyes emoji)
> Drewinva15: His brother is only 1 but he doesn't talk yet soooo can be convenient sometimes
> Chat recipient: What kind of tasks?
> Drewinva15: Well when I get this horny they're both fun to have around (big eyes emoji, devil emoji, crying laughing emoji)

33.     An Administrative Subpoena was served on Cox Communications for the IP address associated with the Snapchat account drewinva15 that was included in the CyberTipline report. The IP address resolved to Robert INGE, located at the **Subject Premises**.

34.     Your affiant opened a Newport News Police Department case for investigation.

35.     On April 4, 2025, your affiant obtained a state search warrant from the Honorable Newport News Circuit Court Judge Christopher Papile for the Snapchat account drewinva15. On April 22, 2025, Snapchat provided a response to the search warrant. Your affiant reviewed the response and observed the following items of note.

36.     In the Subscriber Information section, your affiant observed:

    a.  The account was created on August 14, 2024.
    b.  The current username was drewinva15 and the prior username was drewinge15.
    c.  The phone number associated was 17575530915 and the birthday was listed as June 15, 1989.
    d.  The user deactivated the account on November 4, 2024, and then reactivated it on November 8, 2024. The account was locked on November 11, 2024.

37.     In the Memories section, your affiant observed:

8

a. A latitude and longitude for a Memory that was posted on October 28, 2024. When that data was entered into Google, the latitude and longitude revealed to be the **Subject Premises**.

38. In the Reported Conversations section, your affiant observed:

a. One user reported to Snapchat chat conversations with drewinva15 that took place on October 27, 2024, because "There were suggestions of sexual abuse with minors." In that chat, drewinva15 said he was babysitting his nephews for the weekend in Williamsburg. He also said "Haha I'm kinda a naughty uncle ngl".

b. A second user reported to Snapchat conversations with INGE that took place on November 10, 2024, because "He is talking about putting his seamen on his nephews food and feeding it to him, the child is underage. He should NOT BE ON THIS APP!!!" In that chat, INGE said he rubbed a ton on his toast and also that he buttered it good. When asked how old his nephews were, INGE said, "He's really little haha but it's cool he likes it".

c. A third user reported to Snapchat conversations with INGE that took place on November 10, 2024. These were the same chats reported in CyberTipline report 202200264.

39. In the Conversations section, your affiant observed:

a. On October 20, 2024, INGE engaged in conversation with a user. While talking about his juvenile nephew, INGE asked the user, "Wanna see me unload in his mouth or cover his little body in it". When the user said to unload in his mouth, INGE said,"Love watching him gulp my cum down" and "The head of my dick stretches his mouth sooo much it's hot af". INGE then said, "He's laying here playing with my dick rn", "Bout to have him suck me off here", "Wanna watch?", and "Can I video call you?" INGE then asked the user to send a video of the user to make sure he was real before INGE videoed the act. INGE asked, "You sure you're cool? He's verrrry little lol but if so I'll call now" and then "He's 6, can't wait to show you, will you show us you stroking too?" The user said he was good with the child being 6 years old. INGE appeared to have connectivity issues and said he was resetting his Wi-Fi. INGE asked, "Wanna see me fuck my dick into his tiny ass?", "Okay hold on let me grab some lube", "Alright I'm about to start trying to fuck him", and "Try calling me real quick im gonna cum soon". INGE asked if the user had an iPhone and if they could FaceTime. At 14:44:47 UTC, INGE said he was about to FaceTime. At 14:44:54 UTC, the user responded with awesome. The next chat was at 15:31:02 UTC and the user sent INGE a sticker which was a sleeping emoji. The user then said, "I am weak I am taking a quick nap now".

9

b. On November 10, 2024, INGE engaged in conversation with a user. INGE said he was babysitting his nephews, ages 1 and 7. INGE said, "If you want I will video call you and show you the older kid going down on my cock", "Okay can I call in like half an hour?", "Gonna work his hole open a bit first be", then "Brb". INGE asked, "Wanna see the baby sucking on my head? He's nursing on it right now if I'm being honest". The user responded yes at 23:25:32 UTC. At 23:26:18 UTC, the line entry said "StatusCallEndedVideo".

c. On November 1, 2024, INGE engaged in conversation with a user. INGE told the user "Need to get you with my nephew" and then said his nephew was 6 years old. The user asked what INGE did with him. INGE said, "He sucks my dick mostly, fucked him a few times". When asked if he had pictures, INGE said, "I don't keep pics of him on my phone but I do video chat and shit when he's here".

d. On November 10, 2024, INGE engaged in conversation with a user. INGE said he was babysitting his little nephews for the weekend and gave their ages as 6 and 1. INGE said, "The 1 yo takes my loads regularly cause it's just easy to feed it to him" and "I've fucked the older one but I like watching other guys with him more". The user asked if INGE had any videos of it. INGE replied, "Nah but I do it on video calls sometimes". The user later asked if INGE had any young videos. INGE stated, "Not on here, too risky".

40.     In the main folder, there were numerous image and video files. Your affiant observed:

a. In a video that was sent on October 20, 2024, at 13:52:44 UTC, INGE is seen nude and masturbating. He then said "[Name redacted], come here".

b. In a video that was sent on October 20, 2024, at 13:57:03 UTC, INGE is nude and observed from above the waist. He said, "Watch your teeth buddy". A child is not actually observed in the video.

41.     On April 23, 2025, the state case was adopted federally.

42.     On April 23, 2025, your affiant conducted open-source checks on social media of Robert INGE and located his family members. Your affiant located information that shows INGE has a nephew the same name as referenced by redaction in paragraph 40(a).

43.     On April 23, 2025, Special Agent (SA) Keysha Bailey conducted physical surveillance at the **Subject Premises** and located two vehicles parked in the driveway. The first vehicle was a white Ford bearing Virginia registration TGR7491. A check with the Virginia Department of Motor Vehicles (DMV) found this vehicle to be registered to Robert Alexander Drew INGE, with the **Subject Premises** listed as INGE's residence. The second vehicle was a red Mazda bearing Virginia registration TRZ3663. A check with the Virginia DMV also found

10

this vehicle to be registered to Robert Alexander Drew INGE, with the **Subject Premises** listed as INGE's residence.

44.     On April 24, 2025, at 9:34 a.m., your affiant observed INGE exiting the **Subject Premises**. INGE exited the front door of the **Subject Premises** and got into the Ford sedan bearing Virginia registration TGR7491 reference in paragraph 43 above. INGE then drove away from the **Subject Premises**.

### Biometric Unlock of Devices Subject to Warrant

45.     I ask that the search warrant, to the extent it authorizes the seizure and search of the electronic devices, authorize the use of the biometric unlock features on any such devices owned and/or used by the device user based on the following, which I know from my training, experience, and review of publicly available materials.

46.     Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

47.     In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

48.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the device user's thumb-and/or fingers on the device(s); and (2) hold the device(s)in front of the device user's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### Conclusion

48.     Based on the facts set forth above, your affiant believes probable cause exists, at the **Subject Premises**, of violations of Title 18, United States Code, Sections 2251(a) and (e) which prohibit the production of child pornography and any attempt to do the same, respectively.

11

49.     I further submit that probable cause exists to believe that evidence, fruits, and instrumentalities (more precisely described in Attachment B) of such violations will be found at the **Subject Premises** (more precisely described in Attachment A.)

50.     Accordingly, your affiant requests that a search warrant be issued authorizing FBI agents, representatives of the FBI, with assistance from representatives of other law enforcement agencies as required, to search **the Subject Premises**, (more precisely described in Attachment A), for evidence, fruits, and instrumentalities (more precisely described in Attachment B) of the offenses described in paragraphs 8-9 of this affidavit.

51.     It is further requested that this affidavit, search warrant, and the subsequent inventories be sealed in order to protect the confidentiality of the sources of information and the ongoing investigation.

FURTHER AFFIANT SAYETH NOT.

_____
Heather Call
Special Deputy United States Marshal
FBI Child Exploitation Task Force
Federal Bureau of Investigation

This affidavit has been reviewed for legal sufficiency by Assistant United States Attorney Peter G. Osyf.

Reviewed: _____
            Peter G. Osyf
            Assistant United States Attorney

Subscribed and sworn before me this ___24th___ day of April 2025, in the City of Norfolk, Virginia.

_____
The Honorable Lawrence R. Leonard
UNITED STATES MAGISTRATE JUDGE

12